Howry, J.,
delivered the opinion of the court:
.Congress, by an act approved June 21, 1866 (14 Stats., 68), appropriated $368,548.37 to reimburse the State of West Virginia for enrolling, equipping, and paying such state forces as the State had called into its military service after June 20, 1861, for the prosecution of the war beginning just before that date. The act excluded allowances for troops who did not perform actual military service “ in concert with the forces of the United States.” Commissioners were provided by the act to be appointed, who, on oath, were to examine into the accounts and make settlements on proofs to be offered and taken by the respective governments. Settlement was had and payments made in full for West Virginia’s claim for services rendered by her militia, excluding allowances for those persons not within the act of 1866 and the previous acts of Congress relating to the payment of state troops by the United States.
The men for whom pay is now sought presented no claims to the board authorized to audit nor to the United States. West Virginia presented none for any of these men. Several years elapsed before the claims now. under consideration were presented to the legislature of that State. No muster rolls showing enrollment existed up to the time the claims were presented to the State in 1869. There is no pretense that there were ever 'any muster rolls contemporaneous with the alleged service showing that the men had been taken into the military service; and no claim that they were a part of the militia of the State appears by anything on file among the State’s archives during the war, nor is it contended that any papers showing any kind of a muster were at any time lost.
*596 After twenty years and several hearings the cause must-now be considered closed on the findings now transmitted.’
.Under those acts of Congress which provide for the Court of Claims to render assistance to Congress in the matter of .claims presented against the United States a resolution of the Senate was adopted transmitting a bill to this court for that purpose. The bill alleges that the military services for which claim is here made was called for by the proclamation of the President in pursuance of law and that in response to such call and requisition the governor of West Virginia caused the enrollment and organization of the men whose names herein appear, and that each and every soldier named in the said muster and pay rolls and the said several commands were doing duty in the service of the United States as part of the military forces of the General Government and subject to the rules and articles of war during the entire several periods, and that the amount directed by the bill to be paid was for money paid' “ or secured to be paid ” by the State of West Virginia for troops called for and furnished.
The petition, as well as the bill, is correctly and properly predicated upon those acts of Congress providing for the payment of the militia of a State called into actual service of the General Government. These acts extend back to the foundation of the Government and continue to the present time. In effect they provide for militia of the respective States the same compensation provided by law for the Army of the United States. But all these acts require that the military services rendered by such militia, before payment can be made by the United States, must be military service rendered in concert with the troops of the Federal Government and under the authority of the United States. (Acts February 28, 1795, ch. 36, vol. 1, p. 424; April 20, 1818, ch. 84, vol. 3, p. 444; March 19, 1836, ch. 44, vol. 5, p. 7; July 29, 1861, ch. 25, vol. 12, p. 282; July 17, 1862, ch. 201, vol. 12, p. 597.)
The special act of June, 1866 (14 Stats., 68), making provision for the reimbursement of West Virginia for pay *597 ments, was strictly in line with all previous acts; that is, for men only who having been in the state service became subject to the orders of the United States. And following all the legislation on the subject came a final act- — continuing the policy — approved January 21, 1903 (32 Stats., 775), excluding payment by the United States for any men rendering military service to such State where such men did not become subject to the authority of the United States.
The fundamental idea running through the legislation on the subject is that state militia can only be paid when subject to federal authority. Construing similar acts of Congress relating to claims for reimbursement of expenses properly incurred by the States during the civil war, rules were adopted by the proper departments requiring a showing as to the mustering in as well as actual employment of men in the service of the United States; that is, subject to military orders of the General Government. Organizations raised or attempted to be raised but not mustered and received into, nor actually employed in, the service of the United States were forbidden to be recognized or paid unless such troops were called out and such expenditures incurred under the authority of the President or the Secretary of War. This, under the law, excluded home guards.
By these same rules the proper authorities of each State' were required to certify over their official seals that the amounts claimed for refund had actually been paid by the State to men as a part of the militia of the State.
In a recent case in this court it was held that these rules of the War Department “ have from the beginning been applied by the accounting officers.” (State of Nevada v. United States, 45 C. Cls. R.) The Supreme Court has likewise approved payments to States only where expenses for arming and equipping state military organizations were “properly incurred.” (New York v. United States, 160 U. S., 598.) We know of no case where the court of last resort has disregarded the provisions respecting the reimbursement of state troops only. But if there have been cases where provisional troops not mustered into the state *598 service have been paid then such payments were made contrary to public policy as expressed in numerous public , acts on the subject.
The case here is not proven.
The findings show that none of the men for whom pay is now claimed were amenable to the authority of the United States as militia or troops of West Virginia; that the men rendered no duty of a military character as a part of the forces of the General Government. None of these men, for instance, could have been court-martialed, because they were not enrolled as enlisted men by the State. They were not subject either to federal authority or state authority as troops and consequently they were not soldiers. If they were anything other than private citizens they were home guards. Some of them may have been allied as voluntary local associations of men around their homes, and, as said in the last motion to amend the findings, they may have performed some service as auxiliaries or even as guides; and, as further alleged in the motion, there possibly could have been without them no enforcement of the civil laws of the . State, though the proof is deficient on this point. But there is nothing in the record to justify the contention that they were ever in camp or that the service of any of these men was for a definite time. On the contrary, the most favorable showing made for them by the proof is that as home guards they would meet and disband; come together and go home again at will, all the time claiming the privileges and exercising the rights of citizens, but at no time subject to the military orders of the State or the United States. (These remarks, however, do not apply to the services of Captains Adkins, Alltop, and Harless. These three officers were a part of the state militia, and they and the mustered-in men of their respective companies were duly paid by the United States under the act of June 21, 1866, supra.)
The three state officers who were constituted a board to investigate claims, denominated military claims, and which were placed before the legislature of West Virginia some years after the alleged services were said to have been rendered, did not deal with authenticated muster rolls in the in *599 vestigation of these claims or with rolls that ever had any authorized existence. As a local auditing board under the act of the legislature in question the said board did not deal with muster rolls in the place of authorized rolls claimed to have ever been lost. The local board in question did deal with names appearing on sheets of paper made years after the close of the war without authority. As to some of the so-called companies, the persons filing these sheets of paper in the office, of the secretary of state of West Virginia were not commissioned officers so far as any testimony before the court discloses. These alleged persons seem to have produced no commissions at the time and no commissions are now produced before this court.
As to the three captains who were in commission during the war, who subsequent to the war claimed compensation for certain men whose names never appeared as a part of the militia of West Virginia during the progress of the war, the court must accept as true their sworn statements disclosed on the original rolls made by them that the men subsequently attempted to be listed were not members of their companies or of any companies rendering military service whilst the war was in progress.
The report of the board of state officers was an ex parte proceeding, with no opportunity for cross-examination on the part of the United States. For that reason alone the report is incompetent as evidence to support a claim against the United States. It is deficient in another respect in that it does not disclose the vital fact necessary to make the claims proper demands against the United States. That is, it does not disclose that the men for whose services pay is now claimed were ever at any time subject to the military orders of any officer of the United States. The record evidence overthrows the allegations of the report that the men whose services were recommended for payment were any part of the militia of the State.
This board seems to have relied upon parol evidence; and though they refer, as set forth in the petition, to “ vouchers,” no vouchers have been produced here. Considering that the board had authority under the act of the legislature which ere- *600 ated it to ascertain who in its op inion should be paid, the recommendation of the board must be deemed the result merely of opinion. Predicated upon oral testimony as it is, and that, too, without notice to the' United States, and that it likewise proceeded upon the idea that lists of names appearing on sheets of paper long after the war closed (miscalled “ muster and pay rolls ”) constituted persons whose names appear thereon a part of the militia of the State, the court can not’ deem the particulars of its report competent. The only competent parts of its report (which appear in the findings) are facts disclosing that it was appointed by an act of the state legislature to make up a report on opinion; that it examined into certain claims, and that these claims should be paid by the State.
Notwithstanding there are no objections to any part of the report, this court must deal with competent proof in making its findings in all cases. Demands can not be established xvhere predicated upon incompetent testimony without doing xdolence to the object of the court’s creation. If the court permitted claimant here to prox^e its demands against the United States by the agencies of state officers in the manner set forth, it would not only be a dereliction of duty but a precedent which the court can not afford to establish. The report of an ex parte board of state officers making up a claim for the citizens of the State and then for the State itself long after the alleged services of the citizens in question were rendered (if rendered at all) without notice to the party from whom pay is ultimately sought outside of the State, meantime ignoring the original records, which fail to' establish the most material issue in the case, can not be received as competent evidence except for the legislative act itself, the amount audited, and a recommendation for payment as the result of opinion only.
Section 906 of the Revised Statutes does not make aii axvard or judgment which may be final against a State either binding in law or conclusive as evidence against the United States. (Williams v. United States, 22 C. Cls. R., 116.) The full faith and credit clause of the Constitution does not extend the effect of a decision against a State to the United States.
*601 There is greater reason for excluding as incompetent state* ments resulting from opinion merely of a local auditing board acting by state authority in the effort of the State to establish a claim against the United States under the circumstances set forth in this cause.
The Supreme Court of the United States has held that when this court has presented as part of its findings an essential ultimate fact on which judgment rests the appellate court must reverse if the testimony offered to sustain the conclusion be not competent evidence. (United States v. Clark, 96 U. S., 37.) Conclusions under Tucker Act references are governed by the same rule applied to judgments.
It is true that there is high authority for saying that parties to a litigation may admit evidence of almost any character by agreement. In Shaw v. Stone (1 Cush., 228), Chief Justice Shaw declared that “ as the rules of evidence are made for the security and benefit of the parties, all except-tions may be waived by mutual consent.” The rule stated by the judge who made this decision may apply to private parties, because in such cases it has well, been said judges to a large extent sit quiet and let parties try their cases with as loose an application of the rules of evidence as they themselves may wish. But no such waivers of incompetent testimony can be safely countenanced here where claims of long standing are very frequently sought to be established by incompetent evidence. The Court of Claims of the United States must reserve the right to judge for itself that Avhich is competent and that which is not competent in making findings in the nature of a special verdict, no matter whether exceptions are taken to the testimony or not.
Atkinson, J., having been the governor of West Virginia who failed to approve the act making the appropriations set forth in the findings, took no part in making this report.